IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HEIDI NAUPOTO,<br><br>    Plaintiff,<br><br><br><br>      vs.<br><br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br><br>    Defendant. | MEMORANDUM DECISION AND<br>ORDER ON ADMINISTRATIVE<br>APPEAL<br><br><br><br><br>Case No. 2:09-CV-59 TS |

      This matter comes before the Court on Plaintiff Heidi Naupoto's appeal from the decision of the Social Security Administration denying her application for disability insurance benefits and supplemental security income.  Having considered the arguments set forth by the parties, reviewed the factual record, relevant case law, and being otherwise fully informed, the Court will affirm the administrative ruling, as discussed below.

## I.  STANDARD OF REVIEW

      This Court's review of the ALJ's decision is limited to determining whether its findings are supported by substantial evidence and whether the correct legal standards were applied.[1]

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3] If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4]

The Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[5]  However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the ALJ's.[6]

Plaintiff raises three arguments in her brief: (1) that the ALJ erred by rejecting the treating source evidence in favor of a non-examining reviewing source; (2) that the ALJ erred by failing to address Dr. Malouf's statement explaining the limitations he placed on Plaintiff; and (3) that the ALJ erred by failing to meet his burden of showing that Plaintiff could perform jobs available in the national economy.

## II.  BACKGROUND

A.     PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income on September 24, 2004.  Plaintiff's claim was denied initially on January 26, 2005, and

---

[2]*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[3]*Id*.

[4]*Richardson v. Perales*, 402 U.S. 389, 402 (1981).

[5]*Shepard v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6]*Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

upon reconsideration on April 27, 2005.  Plaintiff timely requested a hearing before an

Administrative Law Judge ("ALJ") on May 17, 2005.

A hearing was held on September 19, 2006, before the ALJ.  The ALJ issued a decision

finding Plaintiff not disabled on January 25, 2007.  The Appeals Council denied Plaintiff's

request for review on November 21, 2008.  Plaintiff then brought the instant action seeking

judicial review of the Commissioner's decision.

B.      STATEMENT OF FACTS

In 2002, Plaintiff injured her back after falling backward and landing on the blacktop

while sitting on a metal bar.[7]  Plaintiff saw her doctor the following day and was treated with

pain medication.[8]  The medication was minimally helpful.[9]  Approximately six months later,

Plaintiff fell on her back again.[10]  Plaintiff's pain worsened at that time and became progressively

worse.[11]  Plaintiff indicated that her injury was aggravated by activity and walking, and alleviated

by lying down.[12]  Plaintiff further indicated that she was limited in her ability to walk, stand,

perform housekeeping activities, and play with her children.[13]  An MRI was performed on

Plaintiff's thoracic spine in May 2005.[14]  That MRI showed a moderate left paracentral soft disk

---

[7]R. 465.

[8]*Id.*

[9]*Id.*

[10]*Id.*

[11]*Id.*

[12]*Id.*

[13]*Id.*

[14]*Id.* at 489.

protrusion at T7-8, a mild to moderate central disk protrusion at T6-7, and a probable tiny right paracentral disk protrusion at T5-6.[15]

In addition to her back pain, Plaintiff suffers from headaches which have required visits to the emergency room.[16]  Plaintiff has also been diagnosed with sleep apnea and it has been recommended that she use a CPAP machine for sleeping.[17]  However, Plaintiff uses oxygen because Medicaid will not pay for a CPAP machine.[18]  Plaintiff has also been diagnosed with Type 2 diabetes mellitus.[19]

Plaintiff sought treatment for mental impairments from Valley Mental Health ("VMH") sometime in 2002.[20]  In June 2002, Plaintiff complained of depression, anxiety, and insomnia.[21]  At that time, Plaintiff was diagnosed with major depressive disorder, dysthymic disorder, and generalized anxiety disorder.[22]  Plaintiff was assigned a Global Assessment of Functioning

---

[15]*Id*.

[16]*Id*. at 203, 217, 226, and 229.

[17]*Id*. at 333.

[18]*Id*. at 365.

[19]*Id*. at 359.

[20]Defendant asserts that Plaintiff began her treatment with VMH in February 2002, citing to R. 425.  However, that record is from June 3, 2002.  *Id*. at 425.

[21]*Id*.

[22]*Id*. at 426.

("GAF") score of 51,[23] indicative of moderate symptoms.  Plaintiff continued treatment with VMH.  Treatment notes indicate that Plaintiff's mood and response to medication varied.[24]

Plaintiff began to be treated by John Malouf Ph.D. for her mental impairments since August 2003.[25]  On February 13, 2004, Dr. Malouf completed a Workplace Functional Ability Medical Report.[26]  That Report states that Plaintiff is not fully stable and that she should continue therapy and medication.[27]

In a letter dated December 8, 2004, and updated March 14, 2005, Dr. Malouf diagnosed Plaintiff with a major depressive disorder, a generalized anxiety disorder, and a personality disorder.[28]  In that letter, Dr. Malouf states: "Heidi has received a lot of treatment, with minimal success.  Based on this, I consider her prognosis to be poor."[29]

On April 11, 2006, Dr. Malouf filled out a Mental Capacity Assessment.[30]  In that Assessment, Dr. Malouf opined that Plaintiff had extreme limitations in her ability to maintain attention and concentration for extended periods and in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.[31]  Dr.

---

[23]*Id.*

[24]*See generally id.* at 285-99, 391-426

[25]*Id.* at 272.

[26]*Id.* at 517.

[27]*Id.* at 518.

[28]*Id.* at 274-75.

[29]*Id.* at 275.

[30]*Id.* at 433.

[31]*Id.*

Malouf also opined that Plaintiff had marked impairments in her ability to work in coordination

with or in proximity to others without being distracted by them, her ability to complete a normal

workday without interruptions from psychologically based symptoms, her ability to complete a

normal workweek without interruptions from psychologically based symptoms, and her ability to

perform at a consisted pace with a standard number and length or rest periods.[32]  Dr. Malouf

further stated that Plaintiff had marked impairments in her ability to interact appropriately with

the general public, her ability to ask simple questions or request assistance, and her ability to get

along with coworkers or peers without distracting them or exhibiting behavioral extremes.[33]  Dr.

Malouf opined that Plaintiff had marked limitations in her ability to respond appropriately to

changes in the work setting and her ability to set realistic goals or make plans independently of

others.[34]  Finally, Dr. Malouf stated that Plaintiff would have four or more absences per month.[35]

Dr. Malouf also opined that Plaintiff met both Listing 12.04, Affective Disorders, and Listing

12.06, Anxiety Disorders.[36]

On May 11, 2006, Plaintiff was seen by Thomas J. Ivory, a licensed clinical social

worker, for an evaluation.[37]  Mr. Ivory diagnosed Plaintiff with posttraumatic stress disorder,

mood disorder, diabetes, neuropathy, sleep apnea, and assessed a GAF score of 41, indicative of

---

[32]*Id*. at 434.

[33]*Id*.

[34]*Id*. at 435.

[35]*Id*. at 434.

[36]*Id*. at 431, 437.

[37]*Id*. at 353-58.

serious symptoms.[38]  Mr. Ivory recommended that Plaintiff not work until cleared to do so by her

medical and mental health provider.

On June 29, 2006, Rose Shorter, M.D., Plaintiff's primary care physician since October

18, 2005, completed a Residual Functional Capacity Questionnaire.[39]  Dr. Shorter indicated that

Plaintiff had a variety of conditions, including chronic back pain, obesity, depression, and

diabetes mellitus.[40]  Dr. Shorter opined that Plaintiff would need to lie or recline for at least six

hours during an eight-hour workday, that she could sit for 45 minutes at a time, and stand/walk

for 10 minutes.[41]  Dr. Shorter opined that Plaintiff would need a job that permitted her to change

positions and would need to take unscheduled breaks.[42]  Dr. Shorter further opined that Plaintiff

was likely to be absent from work more than four times per month as a result of her impairments

or treatments.[43]

On September 16, 2006, Ronald P. Houston, Ph.D., prepared a Psychiatric Review

Technique.[44]  He also prepared a Mental Residual Functional Capacity Assessment.[45]  In the

Mental Residual Functional Capacity Assessment, Dr. Houston opined that Plaintiff had

moderate limitations in her ability to: carry out detailed instructions; maintain attention and

---

[38]*Id*. at 356.

[39]*Id*. at 427-29.

[40]*Id*. at 427.

[41]*Id*.

[42]*Id*. at 428.

[43]*Id*.

[44]*Id*. at 438-49.

[45]*Id*. at 450.

concentration for extended periods; perform activities within a schedule, maintain regular

attendance, and be punctual within ordinary tolerances; work in coordination with or in

proximity to others without being distracted by them; accept instructions and respond

appropriately to criticism from supervisors; get along with co-workers or peers without

distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work

setting; and set realistic goals or make plans independently of others.[46]  Dr. Houston found no

marked or extreme limitations.[47]

On September 28, 2006, Dr. Malouf wrote a letter, explaining his Mental Capacity

Assessment.[48]  In that letter, Dr. Malouf explains that he had been working with Plaintiff for

about three years and has "been concerned about her level of depression and frustrated by her

lack of progress."[49]  Dr. Malouf states: "I spent the first couple of years hoping that we could

move Heidi to the point that she could work, but at some point along the way, I came to the

conclusion that this was not likely."[50]  Dr. Malouf then went on to provide his justification for

rating some of Plaintiff's limitations as marked or extreme.[51]

---

[46]*Id*.

[47]*Id*.

[48]*Id*. at 469-72.

[49]*Id*. at 469.

[50]*Id*.

[51]*Id*. at 469-72.

Plaintiff was evaluated by Edwin R. Christensen, Ph.D., on December 7, 2006.[52]  Plaintiff represented that she was able to cook from recipes, that she cleaned her own dishes, that she speaks with her mother, children, and a friend, that she is able to groom and dress herself, as well as clean her own clothes.[53]  Plaintiff also represented that she can do her own shopping and handle her own money.[54]  Dr. Christensen did note restrictions on her ability to sit or stand for long periods and her ability to lift or carry things.[55]

Dr. Christensen further stated that Plaintiff understood well, remembered appropriately, and followed instructions well.[56]  Plaintiff was able to maintain concentration fairly well, with some problems.[57]  Dr. Christensen stated that Plaintiff's responses to questions were well organized, coherent, and relevant.[58]

Dr. Christensen concluded that Plaintiff did not show significant evidence of memory loss, that she had a pretty good ability to concentrate, and that she was able to follow directions, with one episode of concentration lapse.[59]  Dr. Christensen further stated that plaintiff showed evidence of depression.[60]  Dr. Christensen diagnosed Plaintiff with major depression, generalized

---

[52]*Id*. at 500-06.

[53]*Id*. 503.

[54]*Id*.

[55]*Id*. at 503-04.

[56]*Id*. at 504.

[57]*Id*.

[58]*Id*.

[59]*Id*. at 505.

[60]*Id*.

anxiety disorder with acute anxiety attacks, and personality disorder.[61]  Dr. Christensen assigned Plaintiff a GAF score of 48.[62]

Dr. Christensen also completed a Mental Residual Functional Capacity Assessment.[63]  In that Assessment, Dr. Christensen noted the following moderate limitations: ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or in proximity to others without being distracted by them; ability to interact appropriately with the general public; and ability to accept instructions and respond appropriately to criticism from supervisors.[64]  Dr. Christensen noted no marked or extreme limitations.[65]

C.    HEARING TESTIMONY

An administrative hearing was held on September 19, 2006.  At that hearing, the ALJ heard testimony from Dr. Houston, Plaintiff, and a vocational expert.

Dr. Houston testified concerning Plaintiff's mental condition.  Dr. Houston testified that the "[m]edical record shows evidence of a major depressive disorder, it's recurrent and moderate, as well as a mood disorder, due to a general medical condition."[66]  Dr. Houston testified that

---

[61]*Id.* at 506.

[62]*Id.*

[63]*Id.* at 499.

[64]*Id.*

[65]*Id.*

[66]*Id.* at 40.

there was also evidence of a generalized anxiety disorder, post traumatic stress disorder, and a personality disorder.[67]

Dr. Houston provided testimony on Plaintiff's limitations.[68]  Dr. Houston opined that restriction on daily living would be mild; difficulties in maintaining social functioning would be moderate; difficulties in maintaining concentration, persistence, and pace would be moderate; and one or two episodes of decompression.[69]  Dr. Houston was specifically questioned about the difference between his assessment of Plaintiff's mental residual functional capacity and that of Dr. Malouf.[70]  Dr. Houston testified that Dr. Malouf's assessment did not match his treatment notes.[71]  Dr. Houston did agree, however, with Dr. Malouf's assessment that Plaintiff's prognosis was poor.[72]

The ALJ also heard testimony from Plaintiff.  Plaintiff testified that she felt pretty worthless and that she felt hopeless about life.[73]  Plaintiff testified that she had daily episodes where she would cry, which lasted one to two hours.[74]  Plaintiff testified that she had difficulty sleeping and difficulty concentrating.[75]  Plaintiff also stated that she had memory problems and

---

[67]*Id*. at 41.

[68]*Id*. at 43.

[69]*Id*.

[70]*Id*. at 50-51.

[71]*Id*. at 51.

[72]*Id*. at 51-52.

[73]*Id*. at 58.

[74]*Id*. at 59.

[75]*Id*.

lacked energy.[76]  Plaintiff testified that she had one or two close friends, that she does not really

have occasion to leave home during the day, and that it is hard for her to do so.[77]  Plaintiff further

stated that her anxiety made it difficult for her to do things, such as going to the store.[78]  Plaintiff

stated that she is taking medications for her anxiety and while they "take the edge off," the

anxiety is never completely gone.[79]  Turning to her depression, Plaintiff testified that once or

twice a week she would have days where she does not want to come out of the house, does not

want to come out of her room, does not want to talk to anyone, and just wants to be left alone.[80]

Plaintiff was asked to comment on her level of functionality.[81]  Plaintiff stated that she

does not leave her home unless she has to or she has to do so for her children.[82]  She stated that

she does not go out socially.[83]  Plaintiff testified that her life outside her home would consist of

going to the store and going to doctor appointments.[84]  Plaintiff stated that she no longer does

things that she used to do, such as going out with friends or taking her children places.[85]

---

[76]*Id*. at 60.

[77]*Id*.

[78]*Id*. at 61.

[79]*Id*.

[80]*Id*.

[81]*Id*. at 62.

[82]*Id*.

[83]*Id*.

[84]*Id*.

[85]*Id*.

Plaintiff also testified about her physical condition.  Plaintiff described her back pain as excruciating.[86]  Plaintiff testified that she could not lift more than 5 or 10 pounds, could sit for about 30 to 40 minutes without changing position, stand for about 15 minutes until needing to sit, and could walk for half of a mile.[87]  Plaintiff further stated that spends 10 to 12 hours per day reclining or lying down.[88]

The ALJ then received testimony from a vocational expert.  The vocational expert testified that Plaintiff's past relevant work included: delicatessen clerk/stock clerk, telemarketer, and a check clerk/data clerk.[89]

The ALJ posed the following hypothetical to the vocational expert:

> Physically, I'd like you to assume that you have an individual whose ability to lift would be about 10 pounds occasionally, sitting would be maybe 50 minutes, . . . up to 1 hour for a total of 6 hours in an 8 hour day, standing would be about 15 minutes at one time, and walking would be about 10 minutes at one time for a total of 2 hours during the day.  And the individual would need to lie down about 1 hour during the day, and this could be accomplished in 15 minute morning and afternoon breaks, and also over the lunch period.  And the individual would miss 24 days of work per year due to illness.[90]

In conjunction with these physical limitations, the vocational expert was to consider the mental limitations as set forth in Dr. Houston's Mental Residual Functional Capacity Assessment.[91]

---

[86]*Id*. at 63.

[87]*Id*. at 66-68.

[88]*Id*. at 67.

[89]*Id*. at 72.

[90]*Id*. at 73-74.

[91]*Id*. at 74, 450.

In response, the vocational expert testified that the individual could not perform any of Plaintiff's past jobs, but that such individual could perform three sedentary, unskilled jobs: call out operator, addressor, and order clerk.[92]

In a second hypothetical, the ALJ asked the vocational expert to assume the individual in the first hypothetical would need to lie down or sit in a recliner for two hours out of an eight-hour work day.[93]  The vocational expert testified that this would preclude full-time work.[94]

The ALJ then posed a third hypothetical.[95]  That hypothetical asked the vocational to consider the physical and mental limitations of the first hypothetical, with the following changes: that the individual's ability to maintain attention and concentration for extended periods would be moderately to markedly impaired; the individual's ability to interact appropriately would be moderately to markedly impaired; the individual's ability to accept instructions and respond appropriately to criticism from supervisors was moderately impaired; and the individual's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness would be moderately impaired.[96]  The vocational expert testified that all full-time work would be eliminated with the additional limitations.[97]

---

[92] *Id*. at 74-75.

[93] *Id*. at 76.

[94] *Id*.

[95] *Id*.

[96] *Id*. at 76-77.

[97] *Id*. at 77.

14

D.     THE ALJ'S DECISION

The ALJ issued a decision finding Plaintiff not disabled on January 25, 2007.  The ALJ

found that Plaintiff had not engaged in substantial gainful activity since June 15, 2001, the

alleged onset date.[98]  The ALJ found that Plaintiff suffered from the following severe

impairments: morbid obesity, non-insulin dependent diabetes mellitus, degenerative disc disease,

major depression, generalized anxiety disorder, personality disorder, and polysubstance abuse in

remission.[99]  The ALJ then found that Plaintiff did not have an impairment or combination of

impairments that met or equaled a listed impairment, specifically considering Listings 1.04, 9.08,

12.04, 12.06, and 12.08.[100]  The ALJ found that Plaintiff

> has the residual functional capacity to perform sedentary work with lifting no
> more than 10 pounds occasionally; sitting for a total of 50 minutes at one time for
> a total of six hours in an 8-hour workday; standing no more than 15 minutes at
> one time for a total of two hours in an 8-hour workday; walking no more than 10
> minutes at one time for a total of two hours in an 8-hour workday; lying down for
> one hour total in an 8-hour workday on scheduled breaks and part of the lunch
> hour; and missing 24 days of work, or an average of two days per month, due to
> her impairments.  Furthermore, claimant has moderate limitations in her ability to
> carry out detailed instructions; maintain attention and concentration for <u>extended</u>
> periods; perform activities within a schedule, maintain regular attendance and be
> punctual within customary tolerances; work in coordination with or in proximity
> to others without being distracted by them; accept instructions and respond
> [appropriately to criticisms from supervisors; get along with co-workers or peers
> without] distracting them or exhibiting behavioral extremes; respond
> appropriately to changes in the work setting; and, set realistic goals or make plans
> independently of others.[101]

---

[98]*Id.* at 19.

[99]*Id.*

[100]*Id.* at 19-20.

[101]*Id.* at 20-21.

The ALJ found, based on this residual functional capacity, that Plaintiff was unable to

perform any of her past relevant work, but that Plaintiff could perform a significant number of

jobs in the national economy, such as call out operator, addressor, and order clerk.[102]  As a result,

the ALJ concluded that Plaintiff was not disabled.[103]

### III.  DISCUSSION

Plaintiff raises three arguments in her brief: (1) that the ALJ erred by rejecting the

treating source evidence in favor of a non-examining reviewing source; (2) that the ALJ erred by

failing to address Dr. Malouf's statement explaining the limitations he placed on Plaintiff; and

(3) that the ALJ erred by failing to meet his burden of showing that Plaintiff could perform jobs

available in the national economy.  The Court will address each argument in turn.

### A.     WHETHER THE ALJ ERRED BY REJECTING TREATING SOURCE EVIDENCE

Plaintiff argues that the ALJ erred by rejecting the treating source evidence in favor of a

non-examining reviewing source.

The ALJ, in reviewing the opinions of treating sources, must engage in a sequential

analysis.[104]  First, the ALJ must consider whether the opinion is well-supported by medically

acceptable clinical and laboratory techniques.[105]  If the ALJ finds that the opinion is well-

supported, then he must confirm that the opinion is consistent with other substantial evidence in

---

[102]*Id*. at 26-27

[103]*Id*. at 27-28.

[104]*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[105]*Id*.

16

the record.[106]  If these conditions are not met, the treating physician's opinion is not entitled to

controlling weight.[107]

 This does not end the analysis, however.  Even if a physician's opinion is not entitled to

controlling weight, that opinion must still be evaluated using certain factors.[108]  Those factors

include:

> (1) the length of the treatment relationship and the frequency of examination; (2)
> the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4) consistency
> between the opinion and the record as a whole; (5) whether or not the physician is
> a specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.[109]

After considering these factors, the ALJ must give good reasons for the weight he ultimately

assigns the opinion.[110]  If the ALJ rejects the opinion completely, he must give specific,

legitimate reasons for doing so.[111]

 The ALJ did not accept the opinion of Tom Ivory, LCSW, wherein Mr. Ivory assigned

Plaintiff a GAF score of only 41.[112]  The ALJ found that this GAF score was not supported by the

record or the clinical notes.[113]  Further the ALJ noted that Mr. Ivory had not seen Plaintiff before

---

[106]*Id.*

[107]*Id.*

[108]*Id.*

[109]*Id.* at 1301 (quoting *Drapeau v. Massanri*, 255 F.3d 1211, 1213 (10th Cir. 2001).

[110]*Id.*

[111]*Id.*

[112]R. at 25.

[113]*Id.*

this date and that his assessment was not supported by the opinions of those medical professionals who had more direct contact with Plaintiff.[114]

The ALJ did not accept the opinion of Rose Shorter, M.D., given on June 29, 2006, concerning Plaintiff's residual functional capacity.  The ALJ found that Dr. Shorter's opinion, which indicated very extreme limitations, was not supported by the record, the clinical notes, or Plaintiff's activities of daily living.[115]  Further, Dr. Shorter's records indicated that a comprehensive physical examination was not performed regarding what Plaintiff could or could not do physically.[116]  For these reasons, the ALJ held that Dr. Shorter's opinion as to Plaintiff's residual functional capacity was entitled to substantially diminished weight.

The ALJ also did not accept the opinion of Dr. Malouf as to Plaintiff's mental residual functional capacity and the explanation of those opinions.[117]  The ALJ found that Dr. Malouf's opinions were "not supported by the record nor Dr. Malouf's own clinical notes.  As testified to by the medical expert at the hearing, Dr. Malouf indicates very extreme limitations unsupported by his previous ratings of function, which show claimant has only 'moderate' impairment in mental functioning."[118]  Further the ALJ found that Dr. Malouf's opinions were inconsistent with

---

[114]*Id.*

[115]*Id.*

[116]*Id.*

[117]*Id.*

[118]*Id.* (citations omitted).

Plaintiff's activities of daily living.[119]  As a result, the ALJ found that Dr. Malouf's opinion was entitled to "little controlling weight."[120]

Finally, the ALJ did not accept the opinion of Dr. Christensen.  As noted above, Dr. Christensen assigned Plaintiff a GAF score of 48.  The ALJ found that this score was "not supported by the record and is inconsistent with both his own narrative and mental residual functional capacity."[121]  Specifically, the ALJ noted that Plaintiff "reported normal activities of daily living, including tending to her two children's needs, cooking, cleaning, driving, shopping, taking care of her own personal needs and handling her own finances."[122]  Further, Dr. Christensen's notes indicate that Plaintiff "spoke appropriately, she understood, remembered and followed directions well and she maintained concentration well."[123]  The ALJ also noted that Dr. Christensen indicated no more that moderate limitations in Plaintiff's ability to function mentally.[124]  For these reasons, the ALJ found that Dr. Christensen's opinion was entitled to "little controlling weight."[125]

Plaintiff challenges the ALJ's decision in relation to these medical sources.  In short, the ALJ found that those medical opinions which attached extreme limitations to Plaintiff's abilities

---

[119]*Id.*

[120]*Id.*

[121]*Id.*

[122]*Id.*

[123]*Id.*

[124]*Id.*

[125]*Id.* at 25-26.

were not supported by the record, the clinical notes, or Plaintiff's activities of daily living.  The Court finds that the ALJ properly evaluated the opinions of Plaintiff's treating physicians in this case.  The ALJ specifically addressed each medical source and explained what weight he was giving to each medical source and the reason for that decision, citing to specific portions of the record.  Upon review of the record as a whole, the Court cannot conclude that the ALJ's decision, as it relates to the medical source opinions, is so bereft of substantial evidence to warrant reversal.

The ALJ rejected the assessment of a GAF score of 41 by Mr. Ivory.  As was noted by the ALJ, this score is much lower than the scores assigned to Plaintiff by other health professionals who had much more contact with Plaintiff.  Further, there is nothing in Mr. Ivory's notes to support such a low GAF score.

Turning to Dr. Shorter, she placed strict limitations on Plaintiff's physical abilities.  However, those limitations were not supported by the record, nor are they supported by Plaintiff's daily activities.

As for Dr. Malouf, his marked and extreme mental limitations were inconsistent with the other evidence in the record and Plaintiff's report of her activities of daily living.

Finally, Dr. Christensen's GAF score of 48 is not supported by his own report.  While he indicated that Plaintiff had rather extreme limitations, he noted that Plaintiff was able to cook from recipes, clean her own dishes, groom and dress herself, as well as clean her own clothes.  Additionally, he noted that Plaintiff could do her own shopping and handle her own money.  Further, Dr. Christensen stated that Plaintiff understood well, remembered appropriately, and followed instructions well.  Plaintiff was also able to maintain concentration fairly well.  Dr.

Christensen also stated that Plaintiff's responses to questions were well organized, coherent, and relevant.

Based on the above, the ALJ's decision to give little controlling weight to the medical source opinions discussed above will be affirmed.

B.    WHETHER THE ALJ ERRED BY FAILING TO ADDRESS DR. MALOUF'S STATEMENT EXPLAINING THE LIMITATIONS HE PLACED ON PLAINTIFF

As set out above, on April 11, 2006, Dr. Malouf filled out a Mental Capacity Assessment, where he opined that Plaintiff had various extreme and marked limitations.[126]  After the hearing, the record was left open and Dr. Malouf submitted a letter on September 28, 2006, explaining his Mental Capacity Assessment.[127]  Plaintiff argues that the ALJ erred by failing to address Dr. Malouf's September 28, 2006 letter.

The ALJ has a duty to fully develop the record.[128]  In this case, the record was fully developed.  As noted, the record was left open and Dr. Malouf submitted a supplemental letter. The ALJ specifically mentioned Dr. Malouf's September 28, 2006 letter.[129]  The ALJ stated that he was rejecting Dr. Malouf's opinion "because the opinion given on June 29, 2006 as to the claimant's mental residual functional capacity and the explanation of such opinion given on September 28, 2006 are not supported by the record nor . . . Dr. Malouf's own clinical notes."[130] While it is true that Dr. Malouf did not address in detail the September 28, 2006 letter, the Court

---

[126]*Id*. at 433.

[127]*Id*. at 469-72.

[128]*Carter v. Chater*, 73 F.3d 1019, 1021 (10th Cir. 1996).

[129]R. at 25.

[130]*Id*.

21

cannot find that the ALJ failed in his responsibility to fully develop the record.  Further, the ALJ

provided adequate reasons for rejecting Dr. Malouf's opinion, as discussed above.  Therefore, the

ALJ's development of the record here was adequate.

C.     WHETHER THE ALJ ERRED BY FAILING TO MEET HIS BURDEN OF SHOWING
       THAT PLAINTIFF COULD PERFORM JOBS AVAILABLE IN THE NATIONAL
       ECONOMY

       Plaintiff next argues that the ALJ erred by failing to meet his burden of showing that

Plaintiff could perform jobs available in the national economy.

       As set forth above, the ALJ posed three hypothetical questions to the vocational expert.

In the first hypothetical, the ALJ placed the following physical limitations on the individual:

> Physically, I'd like you to assume that you have an individual whose ability to lift
> would be about 10 pounds occasionally, sitting would be maybe 50 minutes, . . .
> up to 1 hour for a total of 6 hours in an 8 hour day, standing would be about 15
> minutes at one time, and walking would be about 10 minutes at one time for a
> total of 2 hours during the day.  And the individual would need to lie down about
> 1 hour during the day, and this could be accomplished in 15 minute morning and
> afternoon breaks, and also over the lunch period.  And the individual would miss
> 24 days of work per year du to illness.[131]

In conjunction with these physical limitations, the vocational expert was to consider the mental

limitations as set forth in Dr. Houston's Mental Residual Functional Capacity Assessment.[132]

       In response, the vocational expert testified that the individual could not perform any of

Plaintiff's past jobs, but that such individual could perform three sedentary, unskilled jobs: call

out operator, addressor, and order clerk.[133]

---

[131]*Id*. at 73-74.

[132]*Id*. at 74, 450.

[133]*Id*. at 74-75.

In the second hypothetical, the ALJ asked the vocational expert to assume the individual in the first hypothetical would need to lie down or sit in a recliner for two hours out of an eight-hour work day.[134]  The vocational expert testified that this would preclude full-time work.[135]

The ALJ then posed a third hypothetical.[136]  That hypothetical asked the vocational expert to consider the physical and mental limitations of the first hypothetical, with the following changes: that the individual's ability to maintain attention and concentration for extended periods would be moderately to markedly impaired; the individual's ability to interact appropriately would be moderately to markedly impaired; the individual's ability to accept instructions and respond appropriately to criticism from supervisors was moderately impaired; and the individual's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness would be moderately impaired.[137]  The vocational expert testified that all full-time work would be eliminated with the additional limitations.[138]

In his decision, the ALJ found that Plaintiff

has the residual functional capacity to perform sedentary work with lifting no more than 10 pounds occasionally; sitting for a total of 50 minutes at one time for a total of six hours in an 8-hour workday; standing no more than 15 minutes at one time for a total of two hours in an 8-hour workday; walking no more than 10 minutes at one time for a total of two hours in an 8-hour workday; lying down for one hour total in an 8-hour workday on scheduled breaks and part of the lunch hour; and missing 24 days of work, or an average of two days per month, due to her impairments.  Furthermore, claimant has moderate limitations in her ability to

---

[134]*Id*. at 76.

[135]*Id*.

[136]*Id*.

[137]*Id*. at 76-77.

[138]*Id*. at 77.

carry out detailed instructions; maintain attention and concentration for <u>extended</u> periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; accept instructions and respond [appropriately to criticisms from supervisors; get along with co-workers or peers without] distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and, set realistic goals or make plans independently of others.[139]

Plaintiff argues that the residual functional capacity adopted by the ALJ in his decision contains limitations which were not included in the third hypothetical given to the vocational expert and were, therefore, not commented on by her. Specifically, Plaintiff alleges that in the residual functional capacity, the ALJ "assess [Plaintiff's] ability to interact appropriately with the general public as moderately impaired, rather than the mild impairment opined by Dr. Houston. He also rated her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness as moderately impaired, rather than the mild impairment that was part of the initial hypothetical."[140]

Plaintiff misstates the ALJ's decision. The residual functional capacity adopted by the ALJ in his decision does not contain moderate impairments in Plaintiff's ability to interact appropriately with the general public or her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Rather, the hypothetical adopted by the ALJ in his decision is the same as that given to the vocational expert in the first hypothetical.[141] Further, the residual functional capacity adopted by the ALJ is the same as that set out in Dr.

---

[139]*Id.* at 20-21.

[140]Docket No. 12 (citing to R. at 21).

[141]*Compare* R. at 20-21 *with* R. at 73-75.

Houston's Mental Residual Functional Capacity Assessment.[142]  Therefore, the Court must reject Plaintiff's argument that the residual functional capacity adopted by the ALJ was not considered by the vocational expert.

Seemingly recognizing this error, Plaintiff makes a different argument in her reply brief. In her reply, Plaintiff argues that the residual functional capacity adopted by the ALJ did not contain all of the limitations that Dr. Houston found in the Mental Residual Functional Capacity Assessment.  Plaintiff argues that this error, in turn, resulted in faulty vocational expert testimony.

Plaintiff is correct that the ALJ's residual functional capacity assessment does not contain a number of mild limitations which were contained in Dr. Houston's Mental Residual Functional Capacity Assessment.[143]  The ALJ's decision only lists those impairments which were found to be moderate and does not include those that were mild.  Plaintiff argues that the ALJ failed to explain why he did not include these mild restrictions in his residual functional capacity assessment and failed to resolve the discrepancy between Dr. Houston and Dr. Malouf.[144] Plaintiff further argues that it is necessary for the ALJ to articulate a residual functional capacity assessment that ether includes the uncontroverted limitations and specifies their level of severity

---

[142]*Compare id*. at 20-21 *with id*. at 450.

[143]*Compare id*. at 20-21 *with id*. at 450.

[144]In his assessment, Dr. Houston opined that Plaintiff has mild limitations in her ability to: understand and remember detailed instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and travel in unfamiliar places or use public transportation. *Id*. at 450.  Dr. Malouf opined that Plaintiff had moderate limitations in her ability to make simple work-related decisions and travel in unfamiliar places or use public transportation. *Id*. at 434-35.

25

or clearly explains why those limitations are not being included.  Plaintiff argues that only then can the vocational expert properly evaluate Plaintiff's ability to perform work in the national economy.

Plaintiff's argument is flawed for a number of reasons.  First, as set forth above, the vocational expert was asked to consider the mental limitations set out in Dr. Houston's Mental Residual Functional Capacity Assessment when considering Plaintiff's ability to perform work in the national economy.  This included the mild limitations found by Dr. Houston.  Thus, this is not a situation where the vocational expert was asked to testify on a residual functional capacity that differed from that adopted by the ALJ.

Second, the ALJ did resolve the conflict between Drs. Houston and Malouf, though he did not do so explicitly.  In the residual functional capacity adopted by the ALJ, the ALJ noted only those mental limitations which he found to be moderate.  By doing so, he necessarily rejected Dr. Malouf's opinion that Plaintiff had moderate limitations in her ability to make simple work-related decisions and travel in unfamiliar places or use public transportation, thus resolving the conflict.  By listing only those limitations that he found to be moderate, the ALJ necessarily found that the remaining limitations were only mild or non existent.  While it would have been better for the ALJ to specifically set out those limitations that he found to be mild, the Court cannot find that the ALJ erred in his determination that Plaintiff could perform jobs available in the national economy because the vocational expert here did have that information.

IV.  CONCLUSION

Having made a thorough review of the entire record, the Court finds that the ALJ's evaluation and ruling is supported by substantial evidence.  Therefore, the Commissioner's

findings must be affirmed.  Further, the Court finds that the ALJ applied the correct legal standard in determining that Plaintiff did not have a disability.

For the reasons just stated, the Court hereby AFFIRMS the decision below.  The hearing set for October 19, 2009, is STRICKEN.  The Clerk of the Court is directed to close this case forthwith.

DATED   October 14, 2009.

BY THE COURT:

_____

TED STEWART
United States District Judge